**W. G. BRUMIT, d/b/a Dal-Worth Tank Co., Appellant,**

v.

**James E. O. WHITE, d/b/a Blue Flame Gas Co., Appellee.**

No. 14920.

Court of Civil Appeals of Texas.

Dallas.

April 22, 1955.

Rehearing Denied May 27, 1955.

Odeneal & Odeneal, Dallas, for appellant.

Frank Cusack, Dallas, for appellee.

DIXON, Chief Justice.

Appellant, plaintiff in the trial court, sued on sworn account for $659.12, based on an oral contract for labor and materials furnished in the mounting and plumbing of a tank to be used in storing propane gas. The trial court sustained appellee's motion for an instructed verdict.

Because propane gas is highly explosive, the pressure tanks in which it is contained are required to be constructed and maintained in conformity with regulations promulgated by the Railroad Commission of Texas in its Docket 141. Appellant himself testified that his contract with appellee contemplated that the tank in question was to be rebuilt and repaired in a manner to conform to said regulations. Appellant himself also testified and so did his employee William Floyd Miller that the materials used on appellee's tank were not in compliance with the regulations. Some sub-standard parts were used, and the tank leaked. Appellant failed to perform his contract. Consequently he was not entitled to recover the contract price in a suit on the contract.

Appellant did not plead quantum meruit, nor did he offer evidence in support of such a plea. He contends that the language used in his affidavit—that "The charges and prices set forth in Exhibit 'A' were reasonable for such labor and materials"—is sufficient to support judgment in his favor for the reasonable value of the materials furnished and work done.

In our opinion appellant's position is untenable. The quoted allegations were made in connection with appellant's suit on the contract on the theory that he had fully performed the contract according to its terms. They do not purport to refer to the reasonable value of sub-standard parts furnished and work done which failed to measure up to the requirements of the regulations, and which therefore did not comply with the terms of the contract between the parties. There is no testimony in the record to show the value, if any, of such sub-standard parts and work. Appellant's first two points are overruled.

The judgment of the court ordered appellee to return to appellant "his sub-standard materials involved herein." Appellant complains of this part of the judgment on the ground that it does not have support in the pleadings or evidence. We agree with appellant's contention, but since the order is in his favor, he is not in position to complain. If it is error, it is harmless error so far as appellant is concerned. Appellee makes no complaint of the error. Certainly it furnishes no basis for us to reverse and remand on appellant's complaint. Leonard v. Burton, Tex.Civ.App., 11 S.W.2d 668; Rule 434, Texas Rules of Civil Procedure. Appellant's third point on appeal is overruled.

The judgment of the trial court is affirmed.

On Rehearing

In his motion for rehearing appellant says we erred in holding in effect that the contract between the parties was conditioned on compliance with the Railroad Commission regulations since the evidence shows that appellee requested appellant to use all of appellee's fittings and materials already on the tank, some of which were so-called "sub-standard" fittings.

Appellant's contention does not have support in the record. We quote from the testimony of appellant himself:

"Q. Did you ever have any discussion with Mr. White prior to the

time you commenced work, or your employees commenced work on the job, relative to the use of the fittings that were already on there if they could be used? A. Yes. We were instructed to use what we could—what was usable. * * *

"Q. I believe on yesterday you unequivocally stated Mr. White made a deal with you to mount and plumb that truck for the handling of propane liquefied gas products. A. That's right.

"Q. The regulations, or Docket 141, of the Railroad Commission is an integral part of a plumbing job of that type, isn't it? A. That's right.

"Q. In the trade it isn't necessary to actually say, 'I want this job done in accordance with gas Docket 141.' A. Not necessarily; no.

"Q. You understand that the regulations are a part of plumbing it for the handling of propane gas? A. That's right. * * *

"Q. And, there was no doubt in your mind, was there? A. No, doubt, no.

"Q. And, you didn't leave any doubt in Mr. White's mind that the job would be done in that manner, did you? A. He left it up to us to pipe it as we saw fit. * * *

"Q. The question of which fittings would be used and which ones wouldn't be used was left entirely to Dalworth Tank Company? A. Right."

■ Appellant says further that there was no evidence that the tank in controversy leaked after appellant performed his services.

Again, appellant's contention does not have support in the record.

Again, we quote from the testimony of appellant himself:

"Q. Now, when, you returned from this hunting trip, what, if anything, did your brother, Malcolm, tell you about this White truck? A. He told me that they had had some trouble.

"Q. Did he tell you what kind of trouble? A. Yes; he told me they had some trouble at the refinery.

"Q. What kind of trouble at the refinery? A. Well, he said the relief valve was busted, that the hose had burst on it.

"Q. What else? A. And that it was leaking.

"Q. At its fittings and couplings? A. He didn't say where.

"Q. And wanted him to fix it? A. Well, he didn't say. * * *."

We also quote from the testimony of William Floyd Miller, one of appellant's employees:

"Q. Mr. Miller, isn't it a fact, and won't you tell the jury please, the fact that nailed this job in your mind is because it spewed gas when it was loaded at the refinery from fittings, valves and couplings? A. Which fittings?

"Q. All of them. A. All of them?

"Q. Don't you know that's the report that came back to you and that's what nailed this job in your mind? A. I don't know it leaked at all of them.

"Q. Do you know it leaked at any of them? A. I know it leaked at the filler valve.

"Q. What else happened? A. I don't know.

"Q. You heard that right after it happened, didn't you? A. I don't know when it was I heard it.

"Q. That was what burned the thing in your mind? A. I don't know what caused it to leak or why it leaked. * *

"Q. You discussed it with Mr. Brumit? A. I never discussed it. All he told me was the trouble they were hav-

ing. He didn't say particularly what it was or nothing. He told me it leaked and I told him it shouldn't have leaked because it had pressure on it and when he taken it to have the hose reel put in, and it came back and it still had pressure on his lines. * * *

"Q. (By Mr. Cusack) It's a pretty dangerous situation, isn't it? A. I reckon it is. * * *."

Appellant's motion for rehearing is overruled.